UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMAKA NDEGE,

                Plaintiff,

     -against-

SKANSKA USA BUILDING INC.,

               Defendant.

**Case No. 22-CV-4420**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Samaka Ndege, by her attorneys, Crumiller P.C., as and for her complaint against Skanska USA Building Inc. ("Skanska"), respectfully alleges as follows, upon information and belief:

## NATURE OF ACTION

1.  Plaintiff was the only Black, female engineer out of 250 engineers in her workplace. Defendant treated Plaintiff differently, and worse, than her white and/or male engineer counterparts on the basis of her race and gender. The disparate treatment included, *inter alia,* failure to promote, selective enforcement of company policies, disparate allocation of resources, and hostile treatment by executive leadership. Defendant further discriminated against Plaintiff because of her medical conditions and denied her request for a reasonable accommodation. Plaintiff made numerous complaints of disparate treatment and discrimination, but rather than take remedial action, Defendant retaliatorily terminated her. Five days after Plaintiff made a formal written complaint of discrimination to the company's Human Resources ("HR"), Plaintiff was terminated.

2.  Plaintiff brings this action to remedy discrimination and retaliation on the basis of race, gender, and disability, where these protected classes were the driving factors in her disparate treatment and termination, in violation of 42 U.S.C. § 1981 *et seq.* ("§ 1981"); Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human

Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"); and the New York City Human

Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL")*.*

## PARTIES

3.      Plaintiff Ndege is a Black woman who resides in New Jersey. She is a citizen of Australia

who, at all times relevant, was authorized to work in the United States through a work visa (E-3).

Skanska employed Ndege, and sponsored her work visa, from January 2017 until her termination

in August 2020.

4.      Defendant Skanska is a global construction development company with a primary place

of business located at 350 Fifth Avenue, 32nd Floor, New York, NY. Skanska employs over

37,000 people worldwide and had annual revenue of $17.2 billion in 2021.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

and 1343, as Plaintiff has asserted claims that arise under federal laws of the United States. This

Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28

U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form

part of the same case or controversy.

6.      Venue is proper in the Southern District of New York pursuant to 29 U.S.C. §

1391(b)(2), because the events giving rise to Plaintiff's claims occurred within the Southern

District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On June 18, 2021, Plaintiff filed a timely Charge of Discrimination with the U.S. Equal

Employment Opportunity Commission ("EEOC") as to her Title VII claims.

8.      On February 28, 2022, the EEOC issued Ndege a Notice of Right to Sue.

## FACTUAL ALLEGATIONS

9.      Ndege is a civil engineer with a Bachelor's degree in Civil and Environmental

Engineering from the University of Maryland.

10.     In January 2017, Skanska hired Ndege as a Senior Project Engineer.

11.     As an Australian national, Ndege was not a United States citizen at the time of her hire.

Defendant therefore sponsored Plaintiff's work visa, as it has done for numerous other foreign-

born employees.

12.     As a global construction company, Skanska's work was project based; employees would

be staffed on particular projects, with different projects having different numbers of people

depending on the size and scope.

13.     In general, each project had one Account Manager, leading the project, Operations

Directors leading project staff, Project Managers to subdivide scopes of work by discipline,

Engineers to assist their supervising managers, and Superintendents to coordinate field

construction activities. The vast majority of managers and directors were white men, and the

executive team of seven were all white.

14.     All of these positions were set forth in a Career Path Matrix ("CPM") document which

governed mobility and the reporting structure at Skanska. The CPM describes the role

responsibilities of each position, starting with Project Engineer, then Senior Project Engineer,

then Assistant Project Manager and Project Manager all the way up to Chief Operating Officer.

As a Senior Project Engineer, Ndege was on the "Individual Contributor" level, which was the

bottom tier.

15.     Ndege hoped to work her way up the Career Path Matrix, starting with promotion to the next level: Assistant Project Manager, which was on the level of "People Leader/Area Leader." The job summary was the same as above, with the addition of: "lead people" and "lead teams."

16.     The Career Path Matrix did not list any qualifications or criteria for promotion to any particular job or level.

17.     Plaintiff was assigned to engineer the Moynihan Train Hall project, phase 2, which was part of a $2.5 billion transformation of the Pennsylvania Station-Farley Complex in midtown Manhattan. Phase 2 included building a new 255,000-square-foot Train Hall for Long Island Rail Road and Amtrak passengers that increases total concourse floor space in the Pennsylvania Station-Farley Complex by more than 50 percent, as well as 700,000 square feet of new commercial, retail and dining space.

18.     It was a large and exciting project, with approximately 250 engineers assigned. Ndege reported to Project Manager John Diaz.

19.     At the start of her employment, Ndege was the only Black female engineer on the entire project. She was one of only about five Black engineers, and one of about 20 female engineers. That was a relatively typical breakdown for the company, which was extraordinarily white and extraordinarily male-dominated.

20.     Shortly after she started work at Skanska, Ndege designed her annual development goals with Diaz, as Skanska engineers did with their supervisors each year. Ndege's goals were mainly geared toward transitioning from the residential construction she had performed in her last job to the commercial construction she would be doing at Skanska.

21.     Ndege worked hard to distinguish herself during her first year of work at Skanska and achieved all of her annual goals.

22.     For example, while working full time, she completed a professional Building Information Modeling ("BIM") certification from the University of Washington in late 2017.

23.     Ndege was quickly recognized by upper management, as well. Throughout 2017, Senior Vice President of Operations Michael Leondi frequently asked Ndege to "step in" for him and act as an executive proxy for client reporting and official project presentations and tours to stakeholders and corporate communities. This was unusual for a Senior Project Engineer; generally, only higher-level people would have this sort of responsibility.

24.     Leondi also asked Plaintiff to lead the research, production, submission, and maintenance of the Skanska Historic Protection Plan, an initiative Skanska had developed to protect historic structures from potentially adverse ground-borne vibrations and other movement from construction, excavation and tunneling activities.

25.      In this role, she engaged with stakeholders directly to represent Skanska's interests and coordinated with both in-house and stakeholder counsel.

***Disparate Treatment: Failure to Promote; Use of Earned Time off; Allocation of iPads***

26.     In March 2018, a round of promotions was announced. Ndege, having excellent experience and over a year of experience at Skanska, assumed she would be promoted to Assistant Project Manager (APM). Ndege had seen many of her colleagues with her level of experience be promoted to APM, a promotion which would have entailed a substantial salary increase of $20,000 to $40,000. However, Skanska declined to promote Ndege.

27.     Instead, Senior Vice President Justin Post promoted three other engineers from Project Engineer to join Ndege at the level of Senior Project Engineer. All three were male, and none were Black. All were significantly junior to Ndege in terms of their industry experience.

28.     Throughout 2018, Leondi and Post both frequently asked Ndege to conduct group and private presentations and project tours. Ndege was honored to be selected for this work and received nothing but positive feedback on her efforts.

29.     Though she had had her suspicions when she was passed over for promotion, Ndege was disappointed to realize that there were other ways in which, as the only Black female engineer, she was being treated differently from her white and/or male counterparts.

30.     For example, in March 2018, Plaintiff used her earned and accrued paid time off ("PTO") to take a three-week trip abroad, which had been scheduled a year in advance, with Diaz's approval. However, upon her return, Diaz informed her that Post was upset that she had taken the vacation. Diaz suggested she find a way to "stay under the radar" going forward. Meanwhile, the other engineers were free to use their earned vacation time without having to "stay under the radar" afterward.

31.     This disparate treatment regarding PTO continued throughout her tenure. Whenever Ndege attempted to use her earned and accrued PTO, she was criticized by Post, who bitterly complained that he had not taken any vacations in his first ten years at the company. Meanwhile, Plaintiff's white and/or male engineer counterparts regularly used their earned and accrued PTO without incident.

32.     In mid-2018, Lead Civil Project Executive Mike Campana asked Ndege to complete an Envision Sustainability ("ENV") Sustainability Professional ("SP) Certification in civil projects/infrastructure. This would enable the company to certify a key project aimed at obtaining an Envision Sustainability Certificate from the Institute for Sustainable Infrastructure and Harvard University. Ndege did so, enabling the company to secure the extremely lucrative project.

33.     In August 2018, Council and Compliance Manager, Chris Shanahan, left Skanska. Shanahan had a law degree and managed liability issues pertaining to minority and disabled veterans. Although it was outside Ndege's purview, and she already had her own full workload, Leondi assigned Ndege half of the work Shanahan had been doing, including monthly reporting to stakeholders, bringing her total workload to fully one and a half employees' worth at no additional compensation.

34.     Ndege agreed to this enormous increase in her responsibilities and requested a commensurate salary adjustment. For reasons unknown, Leondi told her to ask Project Manager Lek Boonpektrakul, who in turn directed Ndege back to Leondi. Leondi then told her to ask Post, who refused the request, stating that Ndege must first "prove" she could complete the work. She therefore performed the work successfully for the following six months, until a full-time replacement was secured in winter 2018. However, she never received any salary adjustment.

35.     In December 2018, Ndege had to fly to Australia in order to renew her work visa. This was not unusual at Skanska, and in fact the Company maintained a policy to reimburse employees for their visa-related airfare and other work-related travel expenses.

36.     However, Post refused to reimburse Ndege, and she had to bear this considerable expense on her own. He provided no explanation for this departure from Skanska's policy.

37.     Meanwhile, Skanska routinely provided such reimbursement for Ndege's male and/or white colleagues whose visas they were sponsoring.

38.     Also, per company policy, Ndege was entitled to three additional days of PTO to travel to and from Australia for the visa renewal.

39.     However, Post openly resented Ndege's three-day absence and complained via email to Diaz that, company policy notwithstanding, she should not be paid for these three additional

days. Her white, male colleagues, who had traveled for visa renewals, took PTO according to the policy without incident. There was no explanation for the difference in attitude other than the racist, sexist belief that Ndege did not deserve the same level of respect, professional courtesy, and work-life balance as her colleagues.

40.     After Ndege successfully escalated the issue to HR, Post grudgingly approved Ndege's PTO for her visa travel, but held firm in denying reimbursement for her travel expenses and visa fees.[1]

41.     Following this incident, Ndege approached Diaz in his cubicle. She told him that she felt she was being treated differently, and worse than others, as the only Black woman engineer. She pointed to the Visa and PTO issues as examples. Diaz could not, and did not, deny that Ndege was being held to different standards than her colleagues. Rather, he acknowledged the problem and expressed sympathy.

42.     In January 2019, she complained to Diaz again about the disparate treatment, referencing the bizarre reimbursement denial. Again, Diaz simply expressed sympathy, and tried to assist by searching Skanska's intranet for some explanation of why the company would have denied her reimbursement. He could not find any such explanation, as the policy was clear that Ndege should have been reimbursed.

43.     Upon information and belief, Diaz did not escalate Plaintiff's complaints of disparate treatment to the company's HR department, and no formal investigation or remedial action was ever taken in response to these complaints.

44.     Ndege also noticed that, as the only Black woman engineer, she was regularly excluded from social events and was treated coldly by her colleagues.

---

[1] An entire year later, in December 2019, the visa fees were finally approved and reimbursed.

45.     For example, she observed that while Skanska's leadership, including Boonpektrakul, invited big groups of other engineers out for after-work drinks each week, but Ndege was rarely included.

46.     Indeed, Boonpektrakul was particularly hostile to Ndege. When she greeted him in the workplace, he simply ignored her, refusing to say hello or acknowledge her in any way. This was in stark contrast to how he treated white and/or male engineers, whom he greeted warmly.

47.     One of the most notable ways in which Ndege was singled out for worse treatment than her colleagues was the company's inexplicable refusal to provide her with the equipment she needed for her job.

48.     Skanska provided iPads to all of the other engineers and superintendents for use on construction sites. This enabled them to input notes directly into the system, without running back and forth to their desks from interior and exterior elevations to transfer handwritten notes into their computers. Ndege was the only engineer who was not given an iPad to use. No explanation was provided why she alone was forced to work without this essential tool.

49.     This put Ndege at a serious disadvantage: Unlike her counterparts, while surveying over 700,000 square feet of work, she had to spend time going back and forth to her desk to type her handwritten notes into her desktop computer. It was a needlessly cumbersome and inefficient process that forced her to work late most nights just to complete her regular workload, having to spend significantly more time on the same work than her peers.

50.     Diaz often remarked how difficult it was for Ndege to complete her surveying duties without an iPad.  He routinely campaigned to Leondi that Ndege be issued an iPad.

51.     In January 2019, upon Plaintiff's return from Australia, Diaz raised the issue again with Leondi, telling him that Ndege could not efficiently track windows, masonry, architectural finish fabrication and installation without an iPad like all the other engineers had.

52.     Leondi conceded that Skanska offered iPads to their engineers, and that it "shouldn't be a problem" to procure one for Ndege. Leondi then instructed Ndege to email Post to request an iPad, which she promptly did, with Diaz and Leondi copied. However, inexplicably, nobody responded either to that email or to several follow-ups she sent thereafter.

53.     Later that month, Plaintiff complained to Diaz that, once again, she was being treated differently than the other engineers.

54.     Diaz listened sympathetically but did not take further action. It appeared to Ndege that he did not wish to jeopardize his employment by pursuing this issue with the company.

55.     In or about March 2019, Post made another round of promotions. Three white men were all promoted from Senior Project Engineer to Assistant Project Manager, the very promotion that Ndege had been waiting for and was undoubtedly qualified for. However, yet again, the company failed and refused to promote Ndege. Ndege received no recognition, either in salary or status, for the fact she had assumed executive reporting responsibilities and assumed half of an additional full-time role for six months.

56.     In March 2019, Post promoted Ndege's male colleague, Radislow Sawicki, from Project Engineer to Senior Project Engineer (Plaintiff's position). At the time of his promotion, Sawicki had approximately two fewer years of applicable experience than Ndege. Other engineers with comparable experience to Ndege continued to hold and be promoted to the positions of Assistant Project Manager or Project Manager. Meanwhile, Ndege had been stuck in her same position on the lowest tier of the CPM since she had started her employment.

10

***Unwarranted, Retaliatory, and Disparate PIP; Plaintiff Lodges Complaints of Gender-Based
Failure to Promote***

57.    In June 2019, Diaz told Ndege that Post had instructed him to meet with her and HR

Business Partner Leslie Kalucki regarding her job performance and annual development goals

for the rest of the year, which were generally geared toward enhancing her cost management

skills and sustainability acumen.

58.    According to Diaz, Post had insisted Plaintiff's performance required additional

monitoring, although Diaz had told Post that Ndege was performing well and there was no cause

for concern.

59.    Post's intervention was peculiar because the process of setting and achieving annual

development goals was generally left between each engineer and their respective supervisor;

executive leadership did not interfere in this process or second guess the personal development

goals upon which engineers and their supervisors agreed.

60.    Upon information and belief, Post never interfered in the setting of the other engineers'

annual development goals.

61.    Plaintiff nevertheless prepared an updated list of goals for herself for the second half of

the year and uploaded them to the Defendant's online talent portal for Diaz and Post to review.

62.    Diaz then told Plaintiff he had been directed to schedule a meeting with her and Kalucki

for July 19, 2019.

63.    During that meeting, Ndege was completely shocked to hear Kalucki telling her that he

was placing her on a performance improvement plan ("PIP"). Kalucki told Ndege that she had to

accomplish her recently modified list of annual performance goals within the next eight weeks,

instead of the rest of the year, or else she would be fired.

64.     There was no explanation whatsoever for this obvious setup for failure other than a ruse designed to effectuate Ndege's departure from the company.

65.     The other engineers were simply encouraged to achieve their goals over the course of a whole year, not within eight weeks, and not under threat of termination.

66.     Being singled out for this outlandish disparate treatment designed to purge her from the company was extremely disheartening, but Ndege nevertheless resolved to complete her goals within the next eight weeks, as the PIP required.

67.     Before the meeting ended, Kalucki asked Plaintiff what she needed from the Company in order to help maximize her job performance within the eight-week PIP period.

68.     Plaintiff responded that, per her numerous prior requests, she needed the Company to provide her with an iPad just as it had done for the other engineers. Kalucki said she would speak to Post about issuing Plaintiff an iPad, but Post denied this request without explanation.

69.     On or about September 13, 2019, Plaintiff successfully completed her PIP, achieving all of her enumerated goals in record time; a testament to her competency, hard work, talent, and dedication. Plaintiff therefore evaded termination.

70.     Soon after, Kalucki contacted Diaz to confirm that Plaintiff had achieved her goals, and Diaz confirmed that indeed she had.

71.     The following week, in apparent disbelief that Plaintiff defied the odds and fulfilled the obligations outlined in the PIP within just eight weeks, Kalucki again contacted Diaz and asked him whether he was "certain" Plaintiff had fully achieved the required goals. Again, Diaz confirmed that she had done so, and that there was no problem with her job performance.

72.     Diaz subsequently confided in Plaintiff that he had become frustrated by executive leadership's peculiar and time-consuming second guessing of her job performance.

73.     In late September 2019, Plaintiff still had not received an iPad from Defendant. As a result, Diaz, who had become frustrated with Defendant's inaction, purchased Plaintiff an iPad out of pocket.

74.     In or about early January 2020, Plaintiff was assigned a new Project Manager, Jorge Pavia. Plaintiff was not provided a reason for the change in management.

75.     That same month, Plaintiff complained to Pavia that four of her male counterparts had been selected for promotion to Assistant Project Manager while she had not, even though, by all objective criteria, she was performing as well as those counterparts.

76.     Pavia conceded that Plaintiff's record of accomplishments warranted a promotion, but said that ultimately, for reasons unknown to him, executive leadership refused to promote her.

77.     Upon information and belief, Pavia did not escalate Plaintiff's complaint of gender discrimination to HR or anyone else at the Company. No investigation nor remedial action was taken in response to Plaintiff's complaint.

***Disparate Treatment: COVID-19 Policies and Transportation Reimbursement***

78.     On March 27, 2020, Chief Executive Officer Richard Kennedy emailed all employees addressing the COVID-19 crisis. In this email Kennedy, repeatedly emphasized that employee safety was important to Skanska, writing in bold print: **"If you do not feel safe working during this time, speak up. Now is not the time to hold back."**

79.     Plaintiff has a history of pancreatic cancer, which had necessitated the removal of 95% of her pancreas in 2003. As such, Plaintiff is immunocompromised and did not feel safe reporting to the physical workplace any more than strictly necessary, especially given that a number of Skanska employees had already been infected with the coronavirus. Indeed, Plaintiff's

gastroenterologist, Dr. Nathan Krohn, had advised her not to take public transportation and to remain home whenever possible.

80.     As a result, in response to Kennedy's email, Ndege emailed Pavia that day, stating that upon the advice of her physician, she did not feel safe in the workplace, and asked to work from home on days she was not reviewing construction work in the field.

81.     That evening, Pavia summarily denied Plaintiff's request. He made no attempt to engage in any interactive dialogue to determine the extent of Ndege's medical conditions, or whether there was any accommodation which could be made to enable her to continue her work.

82.     On March 27, 2020, Plaintiff again emailed Pavia, asking that she at least be allowed to work from home that coming Wednesday through Friday, as there were no site inspections scheduled. Pavia agreed.

83.     On April 7, 2020, Ndege obtained a note from her gastroenterologist, Dr. Nathan Krohn, to Skanska, stating:

> This is to certify that NDEGE, SAMAKA is under my care for the following:
> · History of pseudopapillary tumor of the pancreas
>
> I discussed with Samaka that in view of the COVID-19 pandemic it is medically advisable to remain home whenever possible, and to avoid travel to New York City unless her physical presence at work is determined to be absolutely essential. Public transportation in particular should be avoided.

84.     In the following weeks, as the COVID-19 crisis intensified and local officials began issuing stay-at-home orders, Defendant began to allow all employees to work from home when they were not physically required at work. Plaintiff, however, was still required to report to the physical workplace. Ndege complained to Pavia that yet again, as the only Black female engineer, she was being subjected to completely different treatment than her peers. Pavia told her

she could work from home along with her colleagues on those days when her physical presence was not needed.

85.     During that time, amid the devastating first wave of the COVID-19 pandemic, a number of Plaintiff's fellow engineers had expressed concern about taking public transportation to work. As a result, the Company began reimbursing employees for their daily garage parking expenses in Midtown Manhattan.

86.     Plaintiff held the same concerns regarding public transit but did not have a car to drive to work. Therefore, on April 16, 2020, Ndege sent an email to Pavia, with Leondi, Post, and Kalucki copied, explaining that her physician had advised her not to take public transportation, and she inquired if her Uber expenses would be reimbursable in lieu of parking expenses, as she did not have a car. According to Ndege's calculation, Uber and private parking were roughly equivalent expenses.

87.     Leondi responded a few minutes later, writing:

I am not sure what makes you think you can determine when and where you work....
You are going to have to make up your mind whether you join the team or not
unconditionally."

88.     He simply ignored the accommodation request as well as the request for reimbursement.

89.     Ndege replied:

I was complying with the letter from Richard Kennedy in informing my manager that I
did not feel safe working on-site during this pandemic.

My gastroenterologist truly believes that an imminent danger exists and I agree that there
is a real danger of death or serious harm to my health in this pandemic. I have weekly
discussions with Jorge [Pavia] who has confirmed I'm performing really well at home,
given these difficult times.

I have not heard otherwise that I'm negatively impacting the team; Jorge, please advise if
this is the case.

90.     Nobody replied to this email.

91.   On April 17, 2020, Ndege emailed HR Business Partner Kalucki:

As stated in previous phone and email conversations with Jorge my Gastroenterologists advised me to work at home, to limit exposure to COVID-19 in my daily interactions with people at work and on public transit (bus & train) which I traditionally use to commute to work.

In response to my statement that I agreed to conduct site QC reviews, my Gastroenterologist advised me to drive or utilize a Uber/Lift, wear full COVID-19 PPE, sanitize my hands before and after getting into the car, and hand washing immediately after arriving in the office and at home.

I am disappointed that I'm deviating from my Doctor's recommendation, however, I will come to the jobsite as requested by senior management based on the rotating schedule.

92.   Kalucki did not respond, so on April 18, Ndege attached Dr. Krohn's note to the

following email:

Leslie, I'm under the care of Gastroenterologists Dr. Krohn, who monitors my health for signs of pancreatic cancer as I'm high risk due to my benign Frantz Tumor removal (removal of 95% of my pancreas).

I rescheduled my yearly MRI, as I don't feel comfortable going into Jersey City Medical Hospital at this time to complete my scans, and in turn, is making me nervous as we don't know the condition of my pancreatic ducts and surrounding organs impacted by the tumor removal.

As of this morning, I began commuting to the Project Office via Uber, ensuring to follow his specific instructions (see attached).

93.   On April 20, 2020, Kalucki replied:

Hi Sophia,
I hope you had a nice weekend. Thank you for submitting the note from your doctor. Much appreciated. I will allow Jorge Paiva to determine when your presence on site is essential as the project is deemed essential by N.Y. Executive Order. All project team members are sharing in the responsibility to oversee the 300 tradespeople on site and to progress the job so thank you for your continued contributions. Feel free to call/email/text me if you have any additional questions.

94.   On April 21, 2020, Ndege sent an email to General Counsel and Ethics & Compliance

Officer Jeff Cruz seeking help and attaching her April 7 note from Dr. Krohn. She wrote:

I was comforted by Rich Kennedy's email in March because he encouraged employees like myself who are deemed high risk, or who did not feel safe working on-site during this COVID-19 pandemic, to speak with their direct supervisor or a HR representative about available options (see attached).

I ha[ve] done just that and have reached out to my supervisors and HR (below), to no avail. I survived a Pancreatic Tumor removal but during the fight I had 95% of my pancreas removed. I provided a doctor's note (attached) that stated "in my view of the COVID-19 pandemic, it is medically advisable [for me] to work at home whenever possible" and to only consider going to the job-site if my presence was "absolutely essential". I have been working efficiently at home since March 24th and have been able to accomplish my tasks utilizing my iPhone, iMessage (individual and group chat for coordination), FaceTime video calls, Webex Video and Audio conferences, emails, Procore, and Google Earth/Maps.

In March, I disclosed to my manager my compromised pre-existing medical condition which makes me particularly vulnerable to contracting and becoming ill with COVID-19. I felt pressured last week after requesting a reasonable accommodation to allow me to continue working at home and come onto the job-site on Wednesday 4/22 via Uber for a QC review of one of my subcontractors (Zonca Terrazzo flooring review with SOM/WSP). Distressed by a call with HR and after the confirmation that my daily Uber expenses would not be reimbursed, I succumb to the request to work on-site for WE 4/24.

I am committed to the project, however, am operating with heightened stress and anxiety as social distancing is not possible given the large number of employees and trade on-site. I'm feeling conflicted as I do not want to compromise my health any further and don't believe my concerns about repeated breaches to social distancing are being taken seriously by HR. While I understand that we are an essential project, understand that even essential businesses must ensure their most vulnerable employees are protected and not negligently exposed to harm.

Please feel free to contact me anytime as I really don't know who else I can discuss my concerns with.

95.    Without Ndege's knowledge or consent, on April 23, 2020, Kalucki contacted Dr.

Krohn's office and prevailed upon an administrative employee to issue a rephrased note

backdated to April 7. Astonishingly, Dr. Krohn's office had complied and issued the following

note:

This is to certify that NDEGE, SAMAKA is under my care for the following:
· History of pseudopapillary tumor of the pancreas

She is cleared to return to work from my standpoint without restriction.

96.    Neither Kalucki nor anyone else mentioned this rephrased and backdated note to Ndege.

97.    In May 2020, Plaintiff visited Dr. Krohn, who advised that a change in her pancreas had prevented her from digesting oil and prescribed a pancreatic enzyme for her to take daily. This made her even more vulnerable to severe COVID infection than she was before.

98.    Dr. Krohn again instructed Ndege to limit her exposure to the virus as much as possible given the fact that she was immunocompromised. Unfortunately, given Defendant's stonewalling and hostility towards her prior accommodation requests, Plaintiff feared making further requests could cost her job. This Hobson's choice – severely risk her physical health or lose her job – began to result in severe emotional distress.

***Continued Protected Activity & Retaliatory Termination***

99.    In or about June 2020, Ndege was passed over in yet another round of promotions. This time, Post promoted Sawicki – Ndege's more junior white, male colleague with less experience – to Assistant Project Manager. Not only had Ndege been a Senior Project Engineer a year longer than him, but her performance was comparable to his, if not better, even though she was still being sabotaged by being forced to work without an iPad.

100.    Diaz explained to Ndege that Project Manager Boonpektrakul had said: "We can't promote everyone every year." However, this did not explain why Ndege was repeatedly passed over for promotion while her less-experienced and less-qualified male counterparts were promoted.

101.    In June 2020, Plaintiff again complained to Pavia that she had been passed over for promotion while her less-experienced and less-qualified male counterparts were promoted.

102.    The two scheduled a meeting wherein Plaintiff asserted that not only was she performing as well as her male counterparts, but she was already performing all of the job duties of an

Assistant Project Manager and most Project Manager duties as well. Plaintiff demonstrated this to Pavia by comparing her job duties to that of an Assistant Project Manager on the Skanska Career Path Matrix.

103.    After Plaintiff's presentation, Pavia conceded Plaintiff was already performing the responsibilities of an Assistant Project Manager. However, he could not offer any explanation why she remained stuck at a level junior to her male counterparts. Nor did he make any promises of a promotion in the near future. Instead, he simply explained that the failure and refusal to promote her was an upper management decision to which he was not privy.

104.    Upon information and belief, Pavia did not escalate Plaintiff's complaint of gender discrimination to the Company's HR department or anyone else. No investigation nor remedial action was taken in response to Plaintiff's complaint.

105.    Plaintiff feared she would suffer retaliation for complaining, but the disparities by now had become too stark as she watched more and more junior white men be promoted over her. On June 2, 2020, by email, Plaintiff lodged a formal complaint of gender discrimination to General Counsel and Ethics & Compliance Officer Jeff Cruz. She complained of "continuously receiving different treatment to [her] male colleagues." Plaintiff offered the Company's disparate application of COVID-19 policies as the most recent example of differential treatment. In this complaint, Plaintiff further expressed her concern that her complaint "would adversely impact [her] ability to renew [her] visa or worse lead to termination."

106.    Unfortunately, Plaintiff's concerns of retaliation were promptly confirmed. Just five days later, on June 7, 2020, Kalucki informed her that Skanska would not renew her work visa in December 2020, and that her employment would terminate at year end. Kalucki said the

termination was not performance based, but rather, was caused by "changes in the labor market due to COVID-19."

107.    The next day, General Counsel and Ethics & Compliance Officer Cruz called Ndege to discuss her formal complaint. Ndege explained that she had been treated disparately in terms of reimbursement, promotion, her annual performance goals, the PIP and having been chronically deprived of the iPad to which she was entitled as a Skanska engineer.

108.    She also informed Cruz that Skanska had just effectively terminated her employment, and that she believed the decision was made in retaliation for her discrimination complaint.

109.    Cruz said that he had to discuss the complaint with Skanska's "ethics panel." Plaintiff asked that Cruz keep her name confidential, and he agreed.

110.    Shortly thereafter, Cruz informed Ndege that the "ethics panel" had advised him that in order to investigate her anonymous complaint, he would need to disclose her identity to additional third parties during the course of the investigation.

111.    Plaintiff agreed to these terms, but also expressed that she feared further retaliation.

112.    Cruz stated that HR Vice President Bryan Grassing would conduct an investigation and follow up with Plaintiff.

113.    On July 15, 2020, Grassing called Plaintiff to introduce himself and confirm the substance of her complaint before he began his investigation.

114.    On August 7, 2020, Grassing called Plaintiff and informed her that his investigation had revealed that there was at least one Project Engineer who had received reimbursement for non-parking transportation expenses, and to "make that fair," he had decided to provide that same amount of reimbursement to Plaintiff as a one-time, flat fee – without regard to the amount of reimbursement either Plaintiff or her comparator actually needed or the transportation expenses

either of them had actually incurred. Grassing did not disclose the amount of the one-time, flat

fee reimbursement that Ndege would be receiving.

115.    He proclaimed that this was a very "good thing," and pressured Plaintiff to verbalize an

agreement with him that it was indeed a "good thing."

116.    Grassing did not address the other elements of Plaintiff's complaint. Instead, Grassing

focused on her prior request to work from home for medical reasons, which he claimed was "not

fair" in light of a vacation Plaintiff had taken earlier in the year using her earned and accrued

PTO. However, Plaintiff had gone on this vacation *before* the pandemic, *i.e.* before Dr. Krohn

had instructed her to isolate herself as much as possible.

117.    Grassing fixated on the difference between the two doctor's notes dated April 7. Ndege

explained that the second note had been obtained and backdated by Kalucki without her consent,

but Grassing nevertheless felt that the second note invalidated the first note.

118.    In any event, the months-old work-from-home request had nothing to do with Ndege's

discrimination complaint. She was disappointed and bewildered to find that Grassing was more

interested in those requests than in the actual discrimination she had suffered.

119.    Nineteen days later, on August 26, 2020, Kalucki summoned Plaintiff for a meeting in

Post's office, where, Kalucki terminated her employment.

***The Effect on Complainant***

120.    Plaintiff has suffered greatly due to Skanska's discriminatory and retaliatory conduct. She

is currently being treated by a psychotherapist for anxiety and depression caused by Skanska's

treatment of her.

121.    Due to her experience at Skanska, Plaintiff continues to suffer from insomnia, depression,

shame, humiliation, feelings of hopelessness, and suicidal ideation.

122.     Following her termination, despite diligent efforts, Plaintiff was unable to find new employment until June 2021.

123.     From the time of her termination until she obtained new employment in June 2021, she was unable to afford her pancreas enzyme medication and had to forego a recommended medical procedure for the remaining portion of her pancreas due to a lack of income and health insurance. Given her medical condition, this lack of access to health care caused Plaintiff substantial additional emotional distress.

**FIRST CAUSE OF ACTION:**
**Discrimination in Violation of § 1981**

124.     Ndege repeats and realleges each allegation set forth above.

125.     Skanska unlawfully discriminated against Ndege in the terms and conditions of her employment by subjecting her to disparate treatment on the basis of her race in violation of § 1981.

126.     As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

127.     Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's federally protected rights.

128.     Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

**SECOND CAUSE OF ACTION:**
**Retaliation in Violation of § 1981**

129.     Ndege repeats and realleges each allegation set forth above.

130.     Skanska unlawfully retaliated against Ndege for her protected discrimination complaints by subjecting her to disparate treatment and terminating her employment in violation of § 1981.

131.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

132.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's federally protected rights.

133.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

### THIRD CAUSE OF ACTION:
### Discrimination in Violation of Title VII

134.    Ndege repeats and realleges each allegation set forth above.

135.    Skanska unlawfully discriminated against Ndege in the terms and condition of her employment by subjecting her to disparate treatment and terminating her employment, on the basis of her race and/or gender, in violation of Title VII.

136.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

137.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's federally protected rights.

138.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

### FOURTH CAUSE OF ACTION:
### Retaliation in Violation of Title VII

139.    Ndege repeats and realleges each allegation set forth above.

140.    Skanska unlawfully retaliated against Ndege for her protected discrimination complaints by subjecting her to disparate treatment and terminating her employment in violation of Title VII.

141.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

142.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's federally protected rights.

143.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

## FIFTH CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL

144.    Ndege repeats and realleges each allegation set forth above.

145.    Skanska unlawfully discriminated against Ndege in the terms and conditions of her employment by subjecting her to disparate treatment and terminating her employment, on the basis of her race and/or gender, in violation of the NYSHRL.

146.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

147.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's rights.

148.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

## SIXTH CAUSE OF ACTION:
### Retaliation in Violation of NYSHRL

149.    Ndege repeats and realleges each allegation set forth above.

150.    Skanska retaliated against Ndege for her protected discrimination complaints in violation of the NYSHRL.

151.     The retaliatory actions to which Ndege was subjected could have dissuaded a reasonable employee in her position from complaining of discrimination.

152.     As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

153.     Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's rights.

154.     Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

## SEVENTH CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL

155.     Ndege repeats and realleges each allegation set forth above.

156.     Skanska unlawfully discriminated against Ndege in the terms and conditions of her employment by subjecting her to disparate treatment and terminating her employment, on the basis of her race and/or gender, in violation of the NYCHRL.

157.     As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

158.     Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's rights.

159.     Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

## EIGHTH CAUSE OF ACTION:
### Retaliation in Violation of NYCHRL

160.     Ndege repeats and realleges each allegation set forth above.

161.    Skanska retaliated against Ndege for her protected discrimination complaints in violation of the NYCHRL.

162.    The retaliatory actions to which Ndege was subjected could have dissuaded a reasonable employee in her position from complaining of discrimination.

163.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

164.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's rights.

165.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

### NINTH CAUSE OF ACTION:
### Failure to Accommodate Disability in Violation of NYSHRL

166.    Ndege repeats and realleges each allegation set forth above.

167.    Ndege is a person with a disability under the meaning of the NYSHRL; (2) Skanska is an employer covered by the statute and had notice of her disability; (3) with reasonable accommodation, Ndege could perform the essential functions of the job at issue; and (4) Skanska refused to make such accommodations.

168.    The retaliatory actions to which Ndege was subjected could have dissuaded a reasonable employee in her position from complaining of discrimination.

169.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

170.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's rights.

171.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

### TENTH CAUSE OF ACTION:
### Failure to Accommodate Disability in Violation of NYCHRL

172.    Ndege repeats and realleges each allegation set forth above.

173.    Ndege is a person with a disability and/or medical condition under the meaning of the NYCHRL; (2) Skanska is an employer covered by the statute and had notice of her disability and/or medical condition; (3) with reasonable accommodation, Ndege could perform the essential functions of the job at issue; and (4) Skanska refused to make such accommodations.

174.    As a result, Ndege has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

175.    Skanska willfully engaged in discriminatory practices with malice and/or reckless indifference to Ndege's rights.

176.    Ndege is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

### DEMAND FOR RELIEF

WHEREFORE, Ndege respectfully requests that this Court enter judgment in her favor:

a) on the First, Second, Fifth, Sixth, Seventh, Eight, Ninth, and Tenth Causes of Action, awarding emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs, in an amount to be determined by the trier of fact;

b) on the Third and Fourth Causes of Action, awarding $300,000 for compensatory damages, and awarding economic damages, attorney's fees, interest, and costs, in an amount to be determined by the trier of fact; and

c) such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Ndege demands a trial by jury.

Dated:    Brooklyn, New York
          May 27, 2022

Respectfully submitted,

_____

Chloe Liederman
Susan K. Crumiller
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
Chloe@crumiller.com
Susan@crumiller.com